IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 2, 2018

**STATE OF TENNESSEE v. NEHEMIAH RIMMER**

**Appeal from the Criminal Court for Shelby County**
**No. 15-05452        John Wheeler Campbell, Judge**

_____

**No. W2018-00496-CCA-R3-CD**

_____

The Appellant, Nehemiah Rimmer, was convicted in the Shelby County Criminal Court of rape of a child, a Class A felony, and received a twenty-year sentence to be served at one hundred percent. On appeal, he contends that the trial court erred by denying his motion to suppress his confession, that the trial court erred by allowing the victim's and her mother's out-of-court statements to be read to the jury, and that the evidence is insufficient to support the conviction. Based upon the record and the parties' briefs, we discern no reversible error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Eric Mogy (on appeal) and Terita Hewlett (at trial), Memphis, Tennessee, for the appellant, Nehemiah Rimmer.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lessie Rainey and Dru Carpenter, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, Officer Rondey Martin of the Memphis Police Department (MPD) testified that on the night of April 10, 2006, he responded to a "criminal assault" call at a home on Tagen Drive. When he arrived, he spoke with the victim's mother. He then detained the Appellant, who also was present. Officer Martin later arrested the Appellant and began asking him for general information such as his name, date of birth, and

address. Officer Martin stated, "Well, after I had just asked him just those questions his response was, just from no interjection from me, that he did it and he needed some help." Officer Martin's partner transported the Appellant to the police department, and Officer Martin escorted the victim and her mother to the Memphis Sexual Assault Resource Center (MSARC). On cross-examination, Officer Martin testified that he could not remember if anyone other than the victim, her mother, and the Appellant was present at the home.

Eddie Scallions testified that in October 2007, he was an investigator for the district attorney's office and collected a cheek swab from the Appellant. The swab was transported to the Tennessee Bureau of Investigation (TBI).

Pam Preston testified as an expert in sexual assault examinations that she was a retired registered nurse and used to be a sexual assault nurse examiner at the MSARC. She examined the seven-year-old victim at 12:15 a.m. on April 11, 2006, but first spoke with the victim's mother privately. Preston read to the jury the following statement made by the victim's mother: "I was told that my nephew, . . . Nehemiah Rimmer, 19 year old black male, forced [the victim] to suck on his penis and he fondled her. Initially I was told by my mother and then my child who told me that." After Preston spoke with the victim's mother, Preston talked privately with the victim. Preston read to the jury the following statement made by the victim: "Nehemiah he told me to suck his thing and he did it for a couple of minutes. And my brother woke and he heard . . . Nehemiah's footsteps. He touched me on my butt and my private part . . . on top of my clothes." The victim pointed to her genital area as her "private part." She denied vaginal or anal penetration.

Preston testified that she examined the victim's entire body and her vaginal area and collected oral, vulvar, and anal swabs. Preston also collected the victim's clothing, including her underwear. Preston said that she did not observe any injuries to the victim, which was not unusual even for a child who had been sexually assaulted. She collected a urine sample in order to test the victim for chlamydia and gonorrhea, and the test was positive for chlamydia. Preston explained that chlamydia was contracted by sexual penetration of the mouth, vaginal area, or anal area. The victim's urine test did not reveal where the victim's infection was located, but Preston acknowledged that the infection could have been in the victim's mouth or vagina. Preston prescribed an antibiotic to treat the victim's infection.

Lieutenant Evertina Halfacre of the MPD testified that on April 11, 2006, she was informed "the victim had been raped" and interviewed the Appellant at the police department. Prior to the interview, Lieutenant Halfacre advised the Appellant of his Miranda rights. He appeared to understand his rights and signed an advice of rights form.

The Appellant agreed to speak with Lieutenant Halfacre and began giving his statement at 12:15 a.m. In the statement, the Appellant denied penetrating the victim's vagina with his penis or fingers. However, he admitted to putting his penis inside her mouth. He said the incident occurred at 11:00 p.m. on Sunday, April 9, in the back bedroom of his grandmother's house on Tagen Drive and that a sleeping four-year-old child also was in the room. Lieutenant Halfacre asked the Appellant, "Whatever made you want [the victim] to suck your penis?" The Appellant answered, "Something just said do it." He explained to Lieutenant Halfacre that he asked the victim "if she ever did it before" and that the victim said, "[Y]es to someone at school." The Appellant told the victim to show him how she "did it," so the victim unzipped his pants, pulled out his penis, and "started sucking." The Appellant denied fondling the victim's buttocks. He told Lieutenant Halfacre that he did not take off the victim's clothes and that he did not ejaculate.

On cross-examination, Lieutenant Halfacre testified that at the time of the Appellant's interview, he was a student taking GED classes. She said that he had been at the police department for "just minutes" when she made contact with him and escorted him to the interview room. She told the Appellant that he was under arrest and that he could give a statement if he wanted to do so. She denied telling him that he could go home if he gave a statement.

Lawrence James, a special agent forensic scientist for the TBI, testified as an expert in forensic DNA analysis that he tested the victim's swabs and underwear. He did not find semen or sperm on the swabs but found a semen stain on the underwear. He compared the DNA profile from the sperm in the semen to the DNA profile in the Appellant's saliva sample, and the profiles matched.

At the conclusion of Agent James's testimony, the State rested its case. The Appellant did not present any proof, and the jury convicted him as charged of rape of a child. After a sentencing hearing, the trial court sentenced him to twenty years to be served at one hundred percent.

## II. Analysis

### A. Motion to Suppress

The Appellant claims that the trial court erred by failing to grant his motion to suppress his confession to Lieutenant Halfacre. The State argues that the trial court did not err. We agree with the State.

Before trial, the Appellant filed a motion to suppress his statement to Lieutenant Halfacre on the basis that he did not give the statement voluntarily. During a hearing on

the motion, Lieutenant Halfacre testified that prior to the Appellant's interview, she read his rights to him from an advice of rights form. The Appellant appeared to understand his rights, signed the form, and agreed to give a statement. He did not appear to be under the influence of an intoxicant and did not exhibit any mental issues that concerned her. Had he done so, she would not have taken his statement. She said that she did not force him or coerce him into giving his statement and that she did not promise him anything in exchange for his statement.

On cross-examination, Lieutenant Halfacre testified that officers arrested the Appellant at his home and brought him to the police department. She began interviewing him at 12:15 a.m. She said that she did not know when he arrived at the police department but that he had been in the interview room "no more than an hour" when he gave his statement. Before the interview, Lieutenant Halfacre advised the Appellant that he was under arrest and read his <u>Miranda</u> rights to him. She did not tell him that he could go home if he gave a statement. Lieutenant Halfacre asked the Appellant to sign the advice of rights form, but he printed his name on the form instead. Lieutenant Halfacre stated, "I had to explain to him what a signature is and I needed a signature, not a [printing] of his name." The Appellant was not handcuffed during his interview but was not free to leave. A transcriptionist also was in the interview room and transcribed the Appellant's answers. After the Appellant gave his statement, Lieutenant Halfacre handcuffed him.

The State introduced the Appellant's advice of rights form and statement into evidence. The advice of rights form showed that the Appellant printed his name on the signature line for waiving his rights but signed his name under his printed name.

The Appellant introduced two letters from Midtown Mental Health Center into evidence. In the first letter, dated May 25, 2006, a clinical psychologist stated that he evaluated the Appellant on May 24, 2006, and that the Appellant "understood the nature of the legal process, he understood the charge and the potential consequences of the charge, and he seemed capable of assisting counsel and participating in his defense." The psychologist said he would render an opinion as to diminished capacity on a later date. In the second letter, dated August 21, 2006, the psychologist stated that the Appellant's evaluation was complete and that the Appellant had learning disabilities but was of average intelligence. The psychologist concluded that the Appellant was depressed but that no evidence supported a diminished capacity defense.

At the conclusion of the hearing, defense counsel argued that the trial court should suppress the Appellant's statement because he had a learning disability and "doesn't even know how to sign [his] name." The trial court stated that that defense counsel's argument about the signature was a "mischaracterization" because the evidence showed that the

Appellant mistakenly printed his name on the form but then signed the form as Lieutenant Halfacre directed. The trial court noted that although the psychologist said the Appellant had a learning disability, the psychologist did not reveal "what his learning disability is" and found him to be of average intelligence. The trial court concluded that nothing indicated the Appellant's learning disability made him incapable of waiving his rights. The court accredited Lieutenant Halfacre's testimony that the Appellant understood what was going on when he gave his statement and denied the Appellant's motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Generally, the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide a privilege against self-incrimination to those accused of criminal activity, making an inquiry into the voluntariness of a confession necessary. See State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). As our supreme court has explained,

> In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." The procedural safeguards must include warnings prior to any custodial questioning that an accused has the right to remain silent, that any statement he makes may be used against him, and that he has the right to an attorney.

State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000). Miranda warnings are necessary only in situations involving custodial interrogation or its functional equivalent. See, e.g., Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980); State v. Dailey, 273 S.W.3d 94, 102-03 (Tenn. 2009).

Our courts look to the totality of the circumstances surrounding the interrogation to determine if the criteria for a proper waiver are met. See State v. Van Tran, 864 S.W.2d 465, 472-73 (Tenn. 1993). In doing so, we consider the following factors regarding the voluntariness of a confession: (1) the appellant's age, education or intelligence level, and previous experience with the police; (2) the repeated and prolonged nature of the interrogation; (3) the length of detention prior to the confession; (4) the lack of any advice as to constitutional rights; (5) the unnecessary delay in bringing the appellant before the magistrate prior to the confession; (6) the appellant's intoxication or ill health at the time the confession was given; (7) deprivation of food, sleep, or medical attention; (8) any physical abuse; and (9) threats of abuse. See State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996). "'[N]o single factor, such as IQ, is necessarily determinative in deciding whether a person was capable of knowingly and intelligently waiving, and [did] so waive, the constitutional rights embraced in the Miranda rubric.'" Blackstock, 19 S.W.3d at 208 (quoting Fairchild v. Lockhart, 744 F. Supp. 1429, 1453 (E.D. Ark. 1989)). Furthermore, this court has stated,

> Coercive police activity is a necessary prerequisite in order to find a confession involuntary. The crucial question is whether the behavior of the state's officials was such as to overbear [Appellant's] will to resist and bring about confessions not freely self-determined. The question must be answered with complete disregard of whether or not the accused was truthful in the statement.

State v. Phillips, 30 S.W.3d 372, 377 (Tenn. Crim. App. 2000) (quotation marks and citations omitted).

Here, the Appellant was nineteen years old when he gave his statement to Lieutenant Halfacre. Although the Appellant had some type of learning disability, he was taking GED classes at the time of his interview and was of average intelligence. Lieutenant Halfacre testified that he did not appear to be under the influence of an intoxicant and that he appeared to understand what was happening. The officer advised him of his rights, and he signed a waiver of rights form. The Appellant gave his statement soon after his arrest and arrival at the police department, and nothing indicates that he complained of being deprived of sleep or food. The Appellant was not physically abused, and Lieutenant Halfacre denied telling him that he could go home if he gave a

statement. In sum, the <u>Huddleston</u> factors do not weigh in favor of finding that the Appellant's statement was involuntary.

## B. Hearsay

The Appellant contends that the trial court erred by allowing Pam Preston to read to the jury the victim's and the victim's mother's out-of-court statements. The State argues that the trial court did not err. We conclude that the trial court erred by allowing Preston to read the victim's mother's statement but that the error was harmless.

Before trial, the Appellant filed a motion to prohibit the State from presenting "testimonial evidence of the victim." In the motion, the Appellant indicated that the victim would not testify and argued that any statements made by her would be hearsay and violate his right of confrontation. On the first day of trial, the trial court asked the State if the victim was going to testify, and the State advised the court that it had tried to serve the victim with a subpoena but that it had been unable to locate her or her mother. Neither the victim nor her mother testified at trial.

During Pam Preston's direct examination, she testified that she interviewed the victim's mother and then the victim. Preston stated that the purpose for her interviewing a child's parent was so that she could "go over the child's medical history with them. And then I would go over a history of the event that brought them in. Just like you would do if you went to a regular office for a complaint. This is a medical complaint." The State asked why she would interview a victim prior to the victim's examination, and Preston answered:

> So I'm taking a history to find out what they came to see me for so that I know what they may need. You know, what kind of counseling might they need. Where might they have injuries. You know, what kind of long-term problems might they encounter from this problem. Do they need to go be seen at the hospital immediately. You know, all those kind of things. What kind of diagnostic test might I need to do based on what I'm being told. And in the case of something like this I also need to know where I most likely [will] find evidence.

Defense counsel objected to Preston's being allowed to read the victim's and the victim's mother's statements from Preston's written report to the jury because the statements were hearsay and "double hearsay," respectively. In a jury-out hearing, counsel also asserted that because Preston's information was used by the police during

their investigation, the statements to Preston were testimonial. The State argued that the statements were admissible pursuant to Tennessee Rule of Evidence 803(4), the hearsay exception for statements made for purposes of medical diagnosis and treatment. The trial court noted that "just because it is eventually used for investigative purposes doesn't mean . . . that it has to be testimonial" and agreed with the State that the statements were admissible under Rule 803(4).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial unless the statement falls under one of the exceptions to the rule against hearsay. See Tenn. R. Evid. 802. Rule 803(4), Tennessee Rules of Evidence, provides the exception to the hearsay rule for "[statements] made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The Advisory Commission Comments for Rule 803(4) clarify that such statements "must be for both diagnosis and treatment."

Our supreme court has explained that "if physicians or other medical personnel rely upon the statement in diagnosing and treating the patient, then the statement should be sufficiently trustworthy to be admissible in a court of law." State v. McLeod, 937 S.W.2d 867, 870 (Tenn. 1996). For both adults and children, courts must consider the circumstances surrounding the statement in order to determine if the statement was made for purposes of medical diagnosis and treatment. This is particularly important for a child's statement "because the child's ability to articulate the reason for the statement may be affected by age or developmental maturity." State v. Stinnett, 958 S.W.2d 329, 332 (Tenn. 1997).

A trial court's factual findings and credibility determinations regarding hearsay are binding upon this court unless the evidence preponderates against them. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). However, the determination of whether the statement in question is hearsay and whether a hearsay exception applies are questions of law that we review de novo. Id. We agree that the victim's and her mother's statements to Preston were hearsay.

In Tennessee, criminal defendants are entitled to confront witnesses against them under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. The exercise of the right to confront "is controlled by the trial judge," and "the trial court's decision will be upheld absent an abuse of discretion." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (internal quotation marks and citation omitted).

"Currently, Crawford v. Washington, 541 U.S. 36 (2004), and its progeny are the controlling authority for determining whether the admission of hearsay violates a defendant's rights under the federal confrontation clause, and this Court has applied Crawford to challenges under the Tennessee Constitution, as well." State v. Parker, 350 S.W.3d 883, 898 (Tenn. 2011). In Crawford, the United States Supreme Court drew a distinction between the admission of testimonial and nontestimonial hearsay, explaining that the admission of nontestimonial hearsay is exempt from Confrontation Clause scrutiny but that the "Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination" for the admission of testimonial hearsay. 541 U.S. at 68. However, the Court did not comprehensively define "'testimonial.'" Id.

Subsequently, in Davis v. Washington, 547 U.S. 813, 822 (2006), the Court determined that courts should examine the statement's "primary purpose." Thereafter, the Court provided the following non-exhaustive list of testimonial statements.

> [1] ex parte in-court testimony or its functional equivalent- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross- examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009) (internal quotation marks and citation omitted). Our own supreme court has agreed that "'an out-of-court statement is testimonial . . . if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.'" State v. Dotson, 450 S.W.3d 1, 69 (Tenn. 2014) (quoting Young v. United States, 63 A.63 1033, 1043-44 (D.C. 2013)).

The Appellant first claims that the victim's hearsay statement to Preston violated his right of confrontation because the victim did not testify. He contends that in finding the victim's statement to be admissible under the hearsay exception in Rule 803(4), the trial court also found the victim's statement to be nontestimonial. He asserts that the victim's statement was testimonial because police officers referred and escorted her to the MSARC and because nurse Preston was "there as a quasi-governmental agent to collect

- 9 -

statements and physical evidence to assist in the prosecution of the offender." We disagree with the Appellant.

In State v. Cannon, 254 S.W.3d 287 (Tenn. 2008), the defendant argued that the admission of the rape victim's statements into evidence through emergency room (ER) medical personnel and a nurse violated his right to confrontation because the victim, while available, did not testify at trial. Our supreme court held that "statements in medical records given for the primary purpose of medical diagnosis and treatment are nontestimonial" and, therefore, governed by the rules of evidence. Cannon, 254 S.W.3d at 303. However, statements made primarily for the purpose of "'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution'" are testimonial and, therefore, generally inadmissible. Id. at 305 (quoting Davis, 547 U.S. at 822). The court concluded that the victim's statements to the nurse, made after the victim spoke with and sought medical diagnosis and treatment from ER personnel, were testimonial and inadmissible because the defendant had no prior opportunity to cross-examine the victim. Id. at 305-06. Therefore, the court did not need to address the issue of whether the nurse's testimony was admissible under Tennessee Rule of Evidence 803(4).

Unlike the victim in Cannon, the victim in this case spoke only with Preston about the abuse. Preston used the information given by the victim to examine her, test her for sexually transmitted diseases, and treat her for chlamydia. The victim was escorted to the MSARC by a police officer late at night and was old enough to understand she was in a medical setting and needed to be truthful. See Stinnett, 958 S.W.2d at 332 (stating that six-year-old victim was old enough to understand that she was being examined by a physician to determine whether there was injury or trauma and she needed treatment). She used child-like terms to describe the abuse, and nothing indicates that she was motivated to lie to Preston. See id. Therefore, the victim's statement to Preston was nontestimonial and properly admitted under Tennessee Rule of Evidence 803(4).

We note that the Appellant contends for the first time and without any citation to authorities that the victim's statement was particularly important because it identified the person who assaulted her. To the extent the Appellant is arguing that the trial court erred by allowing the victim's statement to identify him as her perpetrator, we conclude that the issue has been waived. See State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996) (stating that "[o]rdinarily, issues raised for the first time on appeal are waived"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

In a related argument, the Appellant claims that the victim's mother's statement to Preston was "double hearsay" and inadmissible under Rule 803(4).[1] He contends that while the victim's mother's statement to Preston may have been for purposes of medical diagnosis and treatment of the victim, the victim's statement to her mother was not.

We agree with the Appellant that the victim's mother's statement contained two layers of hearsay: first, the victim's statement to her mother and second, the victim's mother's statement to Preston. When a hearsay statement contains double hearsay, each part must qualify for an exception to the hearsay rule in order to be admissible. Tenn. R. Evid. 805. Here, the trial court found that the victim's mother's statement to Preston "was made in furtherance of diagnosis and treatment." The Appellant does not contest that ruling. Instead, he contests the admissibility of the victim's statement to her mother, which the trial court did not specifically address. The State argues that the victim's statement to her mother also was admissible under the hearsay exception for purposes of medical diagnosis and treatment.

In the present case, we know nothing about the circumstances in which the victim or her grandmother made statements to the victim's mother because none of them testified at trial. Therefore, the record does not establish that the victim made a statement to her mother for purposes of medical diagnosis and treatment. Moreover, given that the victim herself was able to make a trustworthy statement to Preston and that the victim's mother's statement did not add any additional information that would have been necessary for Preston to diagnose and treat the victim, we believe that the trial court erred by allowing Preston to read the victim's mother's statement to the jury.

The admission of inadmissible hearsay is a non-constitutional error. Accordingly, the defendant has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008). "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." Rodriguez, 254 S.W.3d at 372 (citing State v. Toliver, 117 S.W.3d 216, 231 (Tenn. 2003); State v. Francis, 669 S.W.2d 85, 91 (Tenn. 1984)). The evidence shows that the Appellant volunteered to Officer Martin "that he did it and he needed some help." The Appellant later gave a detailed statement in which he said he had the victim fellate him, and his semen was on the victim's underwear. In sum, he has failed to demonstrate that the trial court's error affected the outcome of his trial.

---

[1] The Appellant does not raise any issue regarding the victim's mother's statement violating his right of confrontation.

## C. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the conviction because no physical evidence linked him to the offense and because the State did not have any eyewitnesses, particularly the victim, testify. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Relevant to this case, rape of a child is the unlawful sexual penetration of a victim by a defendant if the victim is more than three years old but less than thirteen years old. Tenn. Code Ann. § 39-13-522(a). "Sexual penetration" includes fellatio. Tenn. Code. Ann. § 39-13-501(7).

Taken in the light most favorable to the State, the proof shows that on the night of April 10, 2006, the police responded to a sexual assault call on Tagen Drive. Officer Martin spoke with the victim's mother and the Appellant, and the Appellant volunteered to Officer Martin that he "did it" and "needed some help." The police arrested the Appellant and transported him to the police department, and he gave a statement to Lieutenant Halfacre in which he told her that he had the seven-year-old victim suck his penis at their grandmother's home on Tagen Drive. Meanwhile, the victim told nurse Preston that the Appellant put his penis in her mouth for a couple of minutes. Physical evidence in the form of the Appellant's semen was on the victim's underwear, linking him to the crime. Accordingly, we conclude that the evidence is sufficient to support the conviction.

### III.  Conclusion

Based upon the record and the parties' briefs, we find no reversible error and affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE